Caruthers, J.,
delivered the opinion of the Court.
The complainant charges, in his bill, that an action of covenant is pending against him, in the Circuit Court of Greene county, in behalf of Snapp, upon the following obligations:
“For, and in consideration of Georgia State Bonds, amounting to $2,250, in the hands of Sam’l S. M. Doak, this day ordered to me by Sam’l Snapp, I, Sam’l W. Doak, promise to pay to the said Snapp, interest on said bonds, at the rate of 6 per cent., in half-yearly payments, from this date. And I moreover promise to pay, on or before the 5th of April, 1845, to the said Snapp, or order, the $2,250 in Georgia State Bonds, or their equivalent in other mo'ney.” The same instrument also conveys in trust, a tract of land, for the security of the debt. Dated 3d of October, 1842.
The bill further charges that the bonds were borrowed for the purpose of selling them to raise funds for the payment of his debts, which were pressing hard upon bim ) and that they were only worth, at the time, about fifty cents in the dollar, .and that was as much as he *182 realized for them-. All this was known to Snapp, and that they were not worth more than that in April, 1845, in the county of' G-reene, where the covenant was to be performed. The object of the bill, is to have the damages- fixed' at that rate, instead of the nominal amount, or the value of' the bonds in other markets, and also to obtain credits for payments made. It is also insisted that the contract was usurious. Demurrer to the bill was disallowed.
The Chancellor decreed that there- was no usury in the- transaction; and that, as the Georgia bonds were not paid on the 5th of April, 1845, Snapp was entitled, under the covenant, to their equivalent in money; that is, what such bonds would have then commanded in cash, in the principal markets in the United States, for such stocks.
It is insisted that the measure of damages is the value, or selling price, of such bonds in Greene county, where the contract was made and to be performed, and not in any distant market, or the value- of them in money at the time they were obtained, which was about fifty cents in the dollar, as it was known by Snapp that Doak wanted them to pay his debts, and that they would only sell for that amount.
This is the only debateable question, in the case, as there is no pretense of usury in the transaction. It was a sale of stocks, to be re-paid in kind, or, if not, whatever such stocks might be worth at that time — not their nominal amount. This case has no resemblance to that of Lanier vs. The Nashville Bank, and some others of that kind, in which the object and purpose was to conceal and cover over a usurious transaction by the *183 loan or sale of depreciated notes, to be paid in money. The principle laid down by Judge Story, in The Bank of the United States vs. Wagoner, 9 Peters, 378, appeared in Turney vs. State Bank, 5 Hump., 409, is the true rule in all such cases. To constitute usury, there must be an “intention knowingly to contract for, and to take usurious interest for: if neither party intended it, and acted Iona ficle and innocently, the law will not infer a corrupt agreement.” There must be an attempt and purpose, by some shift or device, to evade the usury laws. It would not necessarily follow, if the bonds were sold for their nominal value, when they were much depreciated, to be paid in full, at a given time, that it would be usurious. That would depend on the intention and purposes of the parties, whether it was a contrivance to get usurious interest or not. The stocks, or even depreciated bank notes, might be worth to the purchaser, or borrower, more than they would then sell for; or even the lender might prefer to keep them, for the chances of improvement in value, rather than part with them at less than the amount for which they called on their face. But in this case, there was a sale of the stocks bearing six per cent., to be paid back in three years, in the same kind of stocks, reserving only six per cent., in the meantime. If not paid in kind, then the parties agreed that, not their nominal amount at that time, but their equivalent — that is, whatever they might be worth in money — should be paid.
But the main question is, by what rule is the “equivalent in money” to be ascertained? On this question of damages for breach of contract, there is much complication and contradiction in the books, on account of the *184 variety of aspects in which it is presented, and conflicting opinions of Courts and writers. Without going into the general subject, on which, perhaps, too much has been already written, it is enough to say, that we think the rule applied by the Chancellor to this particular case, is the correct one. At all events, it is sufficiently favorable to Doak.
The covenant to pay over, on the 5th of April, 1845, Georgia State Bonds, of the nominal value of $2,250, was, on that day, broken, and what is the damage to Snapp? Whatever that was, both the law and the contract, (for the latter conforms to the rule of the former,) in the provision, than the equivalent in money, shall be paid, must be recovered. The contract does not fix the place or market at which the value of the bonds in money shall be ascertained. That is left for construction of law. As the parties lived in Greene, it is contended that that was the place of payment, and the market value of such bonds at that place is the criterion of damages, although it might appear that in Savannah, or New York, such stocks were selling currently and freely at that time for fifty, or even a hundred per cent., more than in the county of Greene. If this were so, by a few days travel, or even transmission by mail, if the covenant had been performed by the delivery of the bonds, the highest price could have been obtained. There is no market for such stocks in many localities, and perhaps none in Greene. In consequence of this, there is no market value established, and if any, in consequence of want of demand and competition, sales may have to be made at a great sacrifice. Shall a person, who has broken his covenant, by failing, or refusing, to *185 deliver the stocks, escape by paying fifty cents in the dollar, when he can, by going to the usual and proper market, obtain eighty or ninety cents?
This is not an action for the recovery of damages for the non-delivery of merchandize, or specific articles, in which the rule is well settled that the measure of damages, is, the difference of the article contracted for on the day it should have been delivered, and the price agreed to be paid for it: Sedgwick on Dam., 276, text, and note 1. Nor is it a contract simply to replace stocks, or for the purchase of the stocks, which is discussed in the immediately succeeding pages of the same book, but it is a contract to pay for $2,250, in certain stocks of that nominal amount, or what such stocks may be worth in money on a certain day. So the only question is, as to the mode of ascertaining the value of the State bonds, on that day, in cash. It will be observed that there is no place fixed in the contract for the payment of the bonds, or money. We have been referred to no authority on the precise point, but we are satisfied that the correct rule in such cases is, that the covenanter is not confined to any particular place, where, indeed, there may be no market for such stocks, but that principal stock markets of the cities may be referred to, to ascertain the value prices of such stocks.
It may be equitable, as ordered by the Chancellor, to deduct from this the necessary expense, if any, that would have to be incurred in converting the stocks into money.
Upon the whole, we think the decree is right, and affirm it.